

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

**NO. 2-07-214-CV**

IN THE INTEREST OF B.L.M.,
S.B.M., R.A.M., J.W.M.M.,
J.P.B.R., AND L.S.S.R.

------------

FROM THE 367TH DISTRICT COURT OF DENTON COUNTY

------------

## MEMORANDUM OPINION[1]

------------

This is a parental-rights termination case concerning six children. Appellant Bobbie H.—the biological mother of the children—challenges the legal and factual sufficiency of the evidence to support the jury's section 161.001(1) and best-interest findings. Appellants Minnie B. and Rudolph B., pro se—Bobbie's mother and her husband—challenge the legal and factual sufficiency of the evidence to support the jury's findings that Minnie and

---

[1] *See* TEX. R. APP. P. 47.4.

Rudolph should not be named managing conservators of two of the children or possessory conservators of any of the six children. We affirm.

## I. Background

The following summary of the evidence will put the issues into context. We will discuss the evidence in greater detail later in this opinion as it pertains to the individual issues.

Bobbie is twenty-eight years old and the mother of six children: twins B.M. and S.M., age eight; R.M., age five; J.M., age four; J.R., age three; and L.R., age two.[2] School teachers, daycare workers, and medical professionals made at least ten reports concerning the children's welfare to the Department of Family and Prospective Services ("the Department") between 2003 and the time of trial. Those reports, and the Department's investigation of and response to same, included the following incidents.

In October 2004, the Department investigated a report that S.M. had a black eye. When the Department and the Denton County Sheriff's Office went to the family's trailer home to investigate, they found the home in an unlivable

---

[2] Sherman M. is the father of the four older children, and Stephen R. is the father of the two younger children. Stephen did not appear or otherwise respond to the Department's petition to terminate his parental rights, and the trial court terminated his rights. The Department did not seek to terminate Sherman's parental rights.

condition. Michael Hendrix, a sheriff's office investigator, testified that the floor had holes in it, there was no running water, electricity was supplied by an extension cord running from Rudolph and Minnie's trailer next door, the stove and heating unit were inoperable, and the family shared the trailer with two cats and four dogs. Bobbie did, however, have a hotplate and an electric oven to prepare meals. The children had head lice, which Bobbie was attempting to treat with mayonnaise and vinegar or alcohol, but she was not treating the children's bedding or clothing. The Department did not remove the children; instead, it implemented a temporary safety plan under which the children were to stay with Rudolph and Minnie while Bobbie repaired the trailer; the Department paid for the repairs. Bobbie and the children moved back into the trailer when the repairs were complete.

In August 2005, Bobbie took L.R.—who was two months old and had not seen a doctor since birth—to the health department. L.R. had an infection under his neck where baby formula had been allowed to build up. Also, his fingernails were too long, allowing him to scratch himself; the back of his head was flattened from lying on his back excessively; and he had a bad diaper rash. The health department reported L.R.'s condition to the Department, and the Department placed L.R. and J.R. with Rudolph and Minnie for thirty days. Department caseworker Dayana Alcazar inspected Bobbie's trailer on August

3

12 and found it to be very dirty.  Alcazar visited the home again on September 2 and found the trailer to be very clean; but when she visited a third time on September 16, the condition was not as good, and she found cat feces on the floor where L.R. was playing.

In November 2005, Bonnie's electricity was cut off due to nonpayment, and she and the children moved into Rudolph and Minnie's trailer, where they slept on a porch that had been converted into a bedroom.  The small, windowless room was heated by a space heater on a shelf, and Bobbie would smoke in the room with the six children present.  Bobbie and the children slept on a porch glider, two cribs, and a mattress on the floor.  Minnie testified that she slept in the room with the children when Bobbie was working the night shift at the waffle house where she was employed.

On December 25, 2005, Bobbie took L.R. to the hospital because he was having difficulty breathing.  L.R. was hospitalized with pneumonia, and the hospital reported to the Department that Bobbie had been feeding L.R. evaporated milk instead of formula.  Department caseworker Michelle Hiza investigated the referral.  When Hiza went to the hospital, Bobbie was not there; but Hiza was able to interview Minnie—who also happened to be hospitalized at the time—and Rudolph, who was sitting with L.R.  Rudolph told her that he thought Bobbie was a very good mom and that he had no concern

4

about Bobbie's feeding L.R. a mixture of evaporated milk and water. Likewise, Minnie told Hiza that she thought Bobbie was a good mom and that she had no concerns about the children's care. Hiza interviewed Bobbie the next day. Bobbie told her that she was feeding evaporated milk and water to L.R. because he could not keep whole milk or formula down. Hiza testified that Bobbie was "angry, screaming, [and] yelling" during the interview and used a lot of profanity. When Bobbie stayed in the hospital with L.R., the nurses had to wake her up when L.R. was crying and ask her to take care of him; on one occasion, Bobbie rolled over and went back to sleep. When she fed L.R. in the hospital, she sometimes propped L.R. up with a bottle so that he could feed himself.

Further investigation by the Department revealed the following information:

- Dennis K., Bobbie's boyfriend, moved in with Bobbie and the children in December 2005. Dennis had recently been released from prison and had a history of assault and family violence. The record is not clear about how long Dennis lived with Bobbie.

- When B.M. and S.M. began kindergarten, B.M.'s speech was unintelligible and she communicated with grunts; S.M.'s verbal skills were better but still below average for her age.

- B.M. and S.M. often went to school dirty and wearing ill-fitting or inappropriate clothes and shoes.

5

- When Hiza visited R.M., B.M., and S.M. at school, she found their speech unintelligible; she testified that they "really had their own kind of language."

- Hiza also testified that R.M.'s stomach was distended and looked "very unusual." Hiza later saw J.M. and J.R. and observed that their stomachs also "kind of protruded out."

The Department removed all six children on January 3, 2006. The trial court signed an order implementing a service plan for Bobbie on January 27, 2006. Bobbie completed a psychological evaluation with Dr. Mark Foster, who testified that she functioned emotionally on the level of a mid- to early adolescent. Dr. Foster recommended that she take anger management classes, but Bobbie did not attend the classes. The trial court ordered Bobbie to attend weekly counseling sessions with therapist Michelle Greer; Bobbie met with Greer six times then missed several appointments, cursed at Greer over the phone, and refused to attend any more sessions. Bobbie testified that she stopped attending the sessions because she could not pay the fee Greer charged her for missed sessions (the Department paid for the sessions Bobbie actually attended), but Greer testified that she charged the missed-session fee in an attempt to make Bobbie feel as though the therapy had value and that Bobbie refused to attend any more sessions even after Greer offered to reduce the missed-session fee and let Bobbie pay it out over time. Bobbie completed her MHMR assessment and participated in in-home parenting classes as

6

ordered; but CASA advocate Vicky Ulrich testified that the classes had no effect on her parenting ability. Bobbie maintained housing and employment, but she stopped making child support payments a year before trial.

Bobbie visited the children regularly while all six were in foster care in the Denton area. Department workers' written descriptions of the visitations spotlight the Department's concerns with Bobbie's parental abilities:

- Bobbie found a cup half-full of an unidentified liquid in the conference room where the visitation occurred; she emptied the cup and—without washing it—filled it with apple juice; all of the children shared the cup for the duration of the visit;

- She lifted L.R. off the floor by one wrist to stop him from pushing J.R.'s chair;

- When J.R. attempted to walk out of the visitation room, she grabbed him by the wrist and pushed him to the floor;

- She frequently "yelled and screamed" at Department workers during the visits;

- She "made a big deal about the children eat[ing] all the sugar so they could be 'hyper' when they go back" to their foster homes;

- She did not attempt to redirect the children when they engaged in inappropriate behavior, such as climbing on cabinets, playing with electrical outlets, and taking toys from one another;

- She allowed the children to listen to sexually suggestive song lyrics on her cell phone;

7

- She lifted L.R. by his upper arm and argued with a Department worker who told her that lifting L.R. that way might dislocate his shoulder; a few minutes later, she jerked J.R. by his upper arm;

- She mocked J.R. by screaming at him when J.R. cried or lost his temper; and

- She sometimes arrived late and twice left one hour into the two-hour visitation.

After the four older children were placed with relatives in Wichita Falls, Bobbie visited them only three times in a ten-month period. Bobbie testified that she could not visit the children in Wichita Falls because her truck broke down, but she also testified that her mother would provide transportation for the visits. The children's foster father testified that on one visit in Wichita Falls, Bobbie spent thirty or forty minutes with the children, then left to meet with friends. The two younger children remained in foster care in Denton, and although Bobbie was scheduled to visit them twice a month, she visited them only six times in the ten months following July 2006.

At trial, Bobbie testified, "I don't want my children back with me. I can't take care of them" and "I just want visitation." The jury found that Bobbie had violated subsections (D), (E), (N), and (O)[3] of family code section 161.001(1);

---

[3] The jury's findings on subsections (D), (E), and (N) were unanimous. The jury split eleven to one on the subsection (O) findings with regard to each child.

8

that termination of Bobbie's parental rights was in the children's best interest; that the Department should be named as permanent managing conservator of J.R. and L.R.; and that Rudolph and Minnie—who intervened in the termination proceeding—should not be named possessory conservators of any of the children. The trial court terminated Bobbie's parental rights and appointed the Department as the children's permanent managing conservator. This appeal followed.

## II.    Termination of Bobbie's parental rights

### A.    Standard of review

A parent's rights to "the companionship, care, custody, and management" of his or her children are constitutional interests "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758-59, 102 S. Ct. 1388, 1397 (1982); *In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003). In a termination case, the State seeks not just to limit parental rights but to end them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit. TEX. FAM. CODE ANN. § 161.206(b) (Vernon Supp. 2007); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). We strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in favor of

9

the parent.  *Holick*, 685 S.W.2d at 20-21; *In re E.M.N.*, 221 S.W.3d 815, 820 (Tex. App.—Fort Worth 2007, no pet.).

In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must establish at least one ground listed under subdivision (1) of the statute and must also prove that termination is in the best interest of the child.  TEX. FAM. CODE ANN. § 161.001 (Vernon Supp. 2007); *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005).  Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact.  *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987).

Termination of parental rights is a drastic remedy and is of such weight and gravity that due process requires the petitioner to justify termination by clear and convincing evidence.  TEX. FAM. CODE ANN. §§ 161.001, 161.206(a); *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002).  This intermediate standard falls between the preponderance standard of ordinary civil proceedings and the reasonable doubt standard of criminal proceedings.  *In re G.M.*, 596 S.W.2d 846, 847 (Tex. 1980); *In re C.S.*, 208 S.W.3d 77, 83 (Tex. App.—Fort Worth 2006, pet. denied).  It is defined as the "measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth

10

of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007 (Vernon 2002).

When reviewing the evidence for legal sufficiency in parental termination cases, we must determine whether the evidence is such that a fact-finder could reasonably form a firm belief or conviction that the grounds for termination were proven. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We must review all the evidence in the light most favorable to the finding and judgment. *Id.* This means that we must assume that the fact-finder resolved any disputed facts in favor of its finding if a reasonable fact-finder could have done so. *Id.* We must also disregard all evidence that a reasonable fact-finder could have disbelieved. *Id.* We must consider, however, undisputed evidence even if it is contrary to the finding. *Id.* That is, we must consider evidence favorable to termination if a reasonable fact-finder could, and disregard contrary evidence unless a reasonable fact-finder could not. *Id.*

We must therefore consider all of the evidence, not just that which favors the verdict. *Id.* But we cannot weigh witness credibility issues that depend on the appearance and demeanor of the witnesses, for that is the fact-finder's province. *Id.* at 573, 574. And even when credibility issues appear in the appellate record, we must defer to the fact-finder's determinations as long as they are not unreasonable. *Id.* at 573.

11

When reviewing the evidence for factual sufficiency, we must give due deference to the fact-finder's findings and not supplant the verdict with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We must determine whether, on the entire record, a fact-finder could reasonably form a firm conviction or belief that the parent violated the relevant conduct provision of section 161.001(1) and that the termination of the parent's parental rights would be in the best interest of the child. *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If, in light of the entire record, the disputed evidence that a reasonable fact-finder could not have credited in favor of the finding is so significant that a fact-finder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

**B.      Analysis**

**1.      Grounds for termination: Endangerment**

In her first and second issues, Bobbie challenges the legal and factual sufficiency of the evidence to support the jury's findings under family code section 161.001(1)(D) and (E). Subsection (D) authorizes termination if a parent knowingly placed or knowingly allowed the child to remain in conditions or surroundings that endanger the child's physical or emotional well-being, and subsection (E) authorizes termination if a parent engaged in conduct that

12

endangers the child's physical or emotional well-being.  TEX. FAM. CODE ANN. § 161.001(1)(D), (E).

Endangerment means to expose to loss or injury, to jeopardize.  *Boyd*, 727 S.W.2d at 533; *see also In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996). Under subsection (D), it is necessary to examine evidence related to the environment of the child to determine if the environment was the source of endangerment to the child's physical or emotional well-being.  *In re D.T.*, 34 S.W.3d 625, 633 (Tex. App.—Fort Worth 2000, pet. denied).  Conduct of a parent in the home can create an environment that endangers the physical and emotional well-being of a child.  *In re W.S.,* 899 S.W.2d 772, 776 (Tex. App.—Fort Worth 1995, no writ).  For example, abusive or violent conduct by a parent or other resident of a child's home may produce an environment that endangers the physical or emotional well-being of a child.  *See id*. at 776–77; *Ziegler v. Tarrant County Child Welfare Unit*, 680 S.W.2d 674, 678 (Tex. App.—Fort Worth 1984, writ ref'd n.r.e.).

Under subsection (E), the relevant inquiry is whether evidence exists that the endangerment of the child's physical well-being was the direct result of the parent's conduct, including acts, omissions, or failures to act.  *In re R.D.*, 955 S.W.2d 364, 368 (Tex. App.—San Antonio 1997, pet. denied); *Dupree v. Tex. Dep't of Protective & Regulatory Servs.*, 907 S.W.2d 81, 83-84 (Tex.

13

App.—Dallas 1995, no writ). Additionally, termination under section 161.001(1)(E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required. TEX. FAM. CODE ANN. § 161.001(1)(E); *D.T.*, 34 S.W.3d at 634; *In re K.M.M.*, 993 S.W.2d 225, 228 (Tex. App.—Eastland 1999, no pet.). Under either subsection (D) or (E), it is not necessary that the parent's conduct be directed at the child or that the child actually suffer injury. *Boyd*, 727 S.W.2d at 533.

Because the evidence concerning these two statutory grounds for termination is interrelated, we consolidate our examination of it. *See In re J.T.G,* 121 S.W.3d 117, 126 (Tex. App.—Fort Worth 2003, no pet.); *In re B.R.*, 822 S.W.2d 103, 106 (Tex. App.—Tyler 1991, writ denied) (recognizing the link between a parent's conduct and a child's conditions and surroundings).

The Department's brief recites a litany of facts and circumstances that support the jury's endangerment findings, as follows:

- The children were seen eating dog food off the floor of Bobbie's home in February 2003;

- Her home had old dog food matted into the carpet in September 2003;

- There were two large holes in the home's floor, which a sheriff's investigator testified were a hazard to the children in October 2004;

14

- In October 2004, the home had no running water, the stove was disconnected, and electricity was supplied via a power cord connected to Rudolph and Minnie's residence next door, and the Department declared the home unlivable;

- According to Bobbie, the children bathed at Minnie's house, but during the Department's investigation, Minnie was out of town, the house was locked, and Bobbie and the children had no access to water;

- In December 2005, Bobbie and the children were living on the enclosed porch of her mother's trailer;

- The children were not clean when attending daycare, and daycare staff had to bathe them;

- Bobbie took J.M. to daycare with dirty bottles;

- J.R. fell off Bobbie's bed when he was two weeks old;

- The children repeatedly had head lice;

- When she began kindergarten, B.M. could not speak and communicated by grunting; her twin, S.M., could speak, but was behind for her age; they were often dirty and inappropriately clothed; and B.M. had to repeat kindergarten;

- L.R. had an infection on his neck from formula build-up, a flat head from being left on his back excessively, and scratched himself with overlong fingernails;

- The sheets on the children's beds were dirty;

- B.M. appeared to be dehydrated at school;

- Bobbie was unable to afford formula for L.R. and failed to maintain her WIC coverage;

- Bobbie failed to maintain Medicaid coverage for the children;

- Bobbie exhibited an unwillingness or inability to care for L.R. when he was hospitalized;

- In January 2006, Bobbie's home was dirty and had feces on the floor; garbage and cigarettes were accessible to the children; and the dishwasher had no front cover and was a hazard to the children;

- When Department caseworker Hiza visited R.M., B.M., and S.M. at school, they were filthy;

- Bobbie refused to let the Department have J.R.'s hair cut, even though the hair would stick to his face because of the food and mucus in it; and

- In December 2005, Bobbie allowed Dennis K.—who had just been released from prison after serving a sentence for family violence and assault with a deadly weapon—move into her home; Bobbie testified that Dennis did not move in with her until after the Department removed the children from her home, but he was living with her at the time of trial. Also at the time of trial, Dennis was under indictment for a drug charge and a family violence assault charge.

Bobbie also exhibited potentially endangering behavior during supervised visitations with the children after the Department removed them from her home, including the following:

- During one visitation, Bobbie—who was talking on her cell phone—grabbed J.R. by the wrist and pushed him back into the visitation room; J.R. hit his head on the television stand;

- On one occasion, Bobbie found a half-filled cup by the sink in the visitation room; she poured its contents down the sink,

filled the cup with apple juice, and let all six children drink out of it for the duration of the visit;

• All Bobbie provided for the children's lunch during one visit was a loaf of white bread;

• On one occasion, Bobbie lifted L.R. by one wrist; on another occasion, she lifted him over a chair by one arm;

• Bobbie allowed the children to play with potentially dangerous objects during the visitations, such as electrical outlets, and left the baby, L.R., on the floor where he could get knocked over by the other children.

Bobbie argues that while at times her home was dirty and her children were unkempt and had head lice, at other times her home and children were relatively clean. But a more accurate assessment of the record shows—as the State argues—that conditions would improve while the Department was actively involved in Bobbie's life, then deteriorate when its involvement ended.

Viewing all of the evidence in the light most favorable to the verdict, we hold a fact-finder could reasonably form a firm belief or conviction that Bobbie endangered the children. *See In re J.P.B.*, 180 S.W.3d at 573. Thus, the evidence is legally sufficient to support the jury's findings that Bobbie violated family code sections 161.001(1)(D) and (E). We further hold that the evidence is factually sufficient to support the findings. *See In re C.H.*, 89 S.W.3d at 28. We overrule Bobbie's first and second issues.

17

Having determined that the evidence is legally and factually sufficient to support the jury's findings under sections 161.001(1)(D) and (E), we do not reach her third and fourth issues, in which she argues that the evidence is legally and factually insufficient to support the jury's findings under sections 161.001(1)(N) and (O). *See* TEX. R. APP. P. 47.1; *In re J.L.*, 163 S.W.3d at 84; *In re E.M.N.*, 221 S.W.3d 815, 821 (Tex. App.—Fort Worth 2007, no pet.).

### 2. Best interest

In her fifth issue, Bobbie challenges the legal and factually sufficiency of the evidence to support the jury's findings that termination is in the children's best interest. Prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest. TEX. FAM. CODE ANN. § 263.307(a) (Vernon 2002). There is also a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). Nonexclusive factors that the trier of fact in a termination case may use in determining the best interest of the child include:

(1)     the desires of the child;

(2)     the emotional and physical needs of the child now and in the future;

(3)     the emotional and physical danger to the child now and in the future;

(4)     the parental abilities of the individuals seeking custody;

18

(5)     the programs available to assist these individuals to promote the best interest of the child;

(6)     the plans for the child by these individuals or by the agency seeking custody;

(7)     the stability of the home or proposed placement;

(8)     the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and

(9)     any excuse for the acts or omissions of the parent.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).

These factors are not exhaustive; some listed factors may be inapplicable to some cases; other factors not on the list may also be considered when appropriate. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

Michelle Greer, a therapist with whom Bobbie attended six counseling sessions as a part of her service plan,[4] testified that Bobbie was not concerned

---

[4] Greer testified that after six appointments, Bobbie got angry, cursed at Greer over the phone, and told Greer that she would not attend counseling any longer.

19

with the children's condition when the Department removed them from her home and therefore did not feel that she needed to make any changes in the way she cared for them. Ulrich—the CASA advocate—testified that Bobbie did not comply with techniques that were taught in the parenting class that Bobbie took, and the class seemed to have no effect on her progress. Ulrich testified that Bobbie never accepted responsibility for her children's removal and that her refusal to do so was a "huge problem" because "if you don't think that there's a problem, you can't fix it." Department conservatorship worker Amie Fletcher testified that Bobbie failed to exhibit adequate parenting skills during supervised visitations and showed no improvement after her parenting classes. Conservatorship worker Shelby Johnson testified that Bobbie expressed an overall lack of interest in raising the children and providing for their basic needs.

After removing the children from Bobbie's home, the Department eventually placed J.M., R.M., S.M., and B.M. with David and Georgia G., who are relatives of their biological father, Sherman M.[5] When David and Georgia received the children, J.M. and R.M. did not know how to feed themselves and S.M. and B.M. had no concept of how to brush their teeth. Amie Fletcher testified that the children's behavior improved while they lived with David and

---

[5] The children were in other foster homes between the time of removal and the time of placement with David and Georgia.

Georgia. David testified that the children are happy, laughing, and playing. The four children's clarity of speech has improved. Ulrich testified that the children have made good progress after being placed with David and Georgia, and David said that the children are performing school work far above the level at which they performed when they were removed from Bobbie's home. David said that he and Georgia are prepared to raise the four children until their father is able to care for them, or until adulthood otherwise.

J.R. and L.R. have been with a foster family since April 6, 2006.[6] Their foster mother testified that when the family received the children, J.R. communicated by screaming, pointing, and grunting; after twice-a-month speech therapy sessions, J.R. can now speak. L.R. was on medications for breathing problems and projectile vomiting, but he is now medication free. Fletcher noted that the shape of L.R.'s head has improved and attributes his weight gain to a diet of formula instead of evaporated milk. J.R. and L.R.'s foster mother said that she and her husband are committed to adopting the children.

Considering the evidence in light of the applicable *Holley* factors and under the appropriate standards of review, we hold that the evidence is both

---

[6] Like their siblings, J.R. and L.R. were in other foster homes before being placed in the home where they were living at the time of trial.

legally and factually sufficient to support the jury's findings that termination of Bobbie's parental rights is in the best interest of each of the children. *See Holley*, 544 S.W.2d at 371–72; *In re J.P.B.*, 180 S.W.3d at 573; *In re C.H.*, 89 S.W.3d at 28. We overrule Bobbie's fifth issue.

## III.    Ruldolph and Minnie's issues[7]

In their first and second issues, Rudolph and Minnie challenge the legal and factual sufficiency of the evidence to support the jury's findings that the Department, rather than Rudolph and Minnie, should be named as the permanent managing conservators for J.R. and L.R. and that Rudolph and Minnie should not be named as possessory conservators of any of the six children. In their third issue, they argue that the evidence is legally and factually insufficient to show that the jury's findings are in the children's best interest.

Under family code section 153.005, a trial court may appoint a sole managing conservator or joint managing conservators. TEX. FAM. CODE ANN. § 153.005(a) (Vernon Supp. 2007). Section 153.006 allows a trial court to

---

[7] Ruldolph and Minnie attached as appendices to their brief several documents that do not appear in the record. We cannot consider documents attached to an appellate brief that do not appear in the record. *Till v. Thomas*, 10 S.W.3d 730, 733 (Tex. App.—Houston [1st Dist.] 1999, no pet.). This court must hear and determine a case based on the record as filed and may not consider documents attached as exhibits to briefs. *Id.*

appoint one or more possessory conservators if it appoints a managing conservator. *Id.* § 153.006 (Vernon Supp. 2007). "The best interest of the child shall always be the primary consideration of the court in determining the issues of conservatorship and possession of and access to the child." *Id.* § 153.002 (Vernon Supp. 2007). When determining matters of conservatorship, courts may apply the *Holley* factors to determine the child's best interest. *See Blackwell v. Humble,* 241 S.W.3d 707, 723 (Tex. App.—Austin 2007); *Vazquez v. Vazquez*, No. 14-05-01257-CV, 2007 WL 1745324, at *3 (Tex. App.—Houston [14th Dist.] June 19, 2007, no pet. h.); *In re M.A.M.*, 35 S.W.3d 788, 790 (Tex. App.—Beaumont 2001, no pet.) (all applying *Holley* factors to conservatorship issues).

In a jury trial, a trial court may not render an order in contravention of the jury's findings. TEX. FAM. CODE ANN. § 105.002(c)(1)(A) (Vernon Supp. 2007). We review jury findings underlying a conservatorship appointment under the ordinary legal and factual sufficiency review, not under the "clear and convincing" standard applicable to termination proceedings. *In re J.A.J.,* 2007 WL 3230169, at *6 & n.5 (Tex. 2007).

We may sustain a legal sufficiency challenge only when (1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered

23

to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact. *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex. 1998), *cert. denied*, 526 U.S. 1040 (1999); Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error*, 38 TEX. L. REV. 361, 362–63 (1960). In determining whether there is legally sufficient evidence to support the finding under review, we must consider evidence favorable to the finding if a reasonable fact-finder could and disregard evidence contrary to the finding unless a reasonable fact-finder could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 807, 827 (Tex. 2005).

An assertion that the evidence is factually insufficient to support a fact finding means that the evidence supporting the finding is so weak or the evidence to the contrary is so overwhelming that the answer should be set aside and a new trial ordered. *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965). We are required to consider all of the evidence in the case in making this determination, not just the evidence that supports the finding. *Mar. Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406-07 (Tex.), *cert. denied*, 525 U.S. 1017 (1998).

In addition to the evidence recounted above, Rudolph and Minnie point to the following evidence in support of their legal and factual insufficiency issues.

24

Minnie testified that Bobbie and the children always had access to the bathroom and running water in Minnie's trailer—even when Minnie and Rudolph were out of town because they would leave the trailer unlocked. Registered nurse Kim Frenette testified that when L.R was in the hospital, Minnie helped Frenette care for L.R., appeared concerned about his well-being, held him, and fed him his bottle. Minnie testified that when the school called her about the children's lice infestation, she treated their hair with a commercial lice treatment and that they never had lice when they were living in her home. David G. and Department workers Shelby Johnson and Amie Fletcher testified that Minnie's visits with the children were "appropriate" and that Minnie was "nurturing." Minnie also provided food for the children during visitations and made clothing for them for Christmas and Easter.

The Department notes that Johnson also testified that Minnie "was very quick to make excuses" for Bobbie when Bobbie acted inappropriately during visitations and that the lives of the children did not improve while Minnie was involved unless the Department was also actively involved. Minnie and Rudolph told Department caseworker Hiza that they had no concerns about Bobbie's parenting ability. Minnie testified that she and Randolph were financially unable to furnish formula for L.R. when Bobbie was feeding him evaporated milk. When asked how she could afford to take a vacation but not help provide

25

necessities for the children, Minnie testified that it was not her responsibility to provide for them.

Considering all of the evidence in the light most favorable to the jury's verdict on managing and possessory conservatorship, we hold that there is not a complete lack of evidence of a vital fact and that the evidence does not conclusively establish the opposite of a vital fact; thus, the evidence is legally sufficient to support the jury's verdict. *See Uniroyal Goodrich Tire Co.*, 977 S.W.2d at 334. Nor is the evidence supporting the verdict so weak or the evidence to the contrary so overwhelming that the answer should be set aside and a new trial ordered; thus, the evidence is factually sufficient. *See Garza*, 395 S.W.2d at 823. Therefore, we overrule Rudolph and Minnie's first three issues.

In their fourth issue, Rudolph and Minnie argue that their retained trial counsel rendered ineffective assistance by failing to cross-examine the physician who treated L.R., failing to offer photographs of the children and medical records pertaining to J.R. as evidence, and failing to call Rudolph to testify. In Texas, there is a statutory right to counsel for indigent parents in parental-rights termination cases, and this right embodies the right to effective counsel. *In re M.S.*, 115 S.W.3d at 544; *see* TEX. FAM. CODE ANN. § 107.013(a)(1) (Vernon Supp. 2007). But the statute provides that this right

26

only applies to the parents of the child that is the subject of the termination. *In re J.S.*, No. 02-04-00277-CV, 2005 WL 1693537, at *5 (Tex. App.—Fort Worth July 21, 2005, no pet.) (mem. op.). Rudolph and Minnie cite no authority to support their claim that a grandparent intervenor in a parental termination suit has a constitutional or statutory right to effective assistance of counsel. Because they had neither a constitutional nor statutory right to counsel, they cannot raise a claim of ineffective assistance of counsel, and we overrule their fourth issue. *See id.* (holding great-grandparent intervenor who sought to be appointed managing conservator of child had no constitutional or statutory right to counsel and could not raise ineffective-assistance claim on appeal).

Rudolph and Minnie's fifth issue is "[w]hether there is a legal ruling about person #1 questioning person #2 in a hospital and person #2 is taking pain medication." Their entire argument under this issue comprises the following two sentences: "Michelle Hiza, TDFPS case worker, in January 2006, interviewed [Minnie] at the hospital. She stated that [Minnie] was a patient at the hospital."

An issue on appeal unsupported by argument or citation to any legal authority presents nothing for the court to review. *Strange v. Cont'l Cas. Co.*, 126 S.W.3d 676, 678 (Tex. App.—Dallas 2004, pet. denied), *cert. denied*, 543

27

U.S. 1076 (2005). Further, "we know of no authority obligating us to become advocates for a particular litigant through performing their research and developing their argument for them." *Tello v. Bank One*, *N.A.*, 218 S.W.3d 109, 116 (Tex. App.—Houston [14th Dist.] 2007, no pet.). Thus, an inadequately briefed point may be waived on appeal. *Hall v. Stephenson,* 919 S.W.2d 454, 467 (Tex. App.—Fort Worth 1996, writ denied)*; see also Fredonia State Bank v. Gen. Am. Life Ins. Co.*, 881 S.W.2d 279, 284–85 (Tex. 1994) (discussing "long-standing rule" that point may be waived due to inadequate briefing).

Rudolph and Minnie's fifth issue is unsupported by argument or citation to any legal authority; moreover, we cannot even discern from the issue statement what complaint they intended to raise. Therefore, we overrule their fifth issue as inadequately briefed.

## IV. Conclusion

Having overruled Bonnie's first, second, and fifth issues and all of Rudolph and Minnie's issues, and not having reached Bonnie's third and fourth

28

issues, we affirm the trial court's order terminating Bonnie's parental rights and appointing the Department as the children's permanent managing conservator.


ANNE GARDNER
JUSTICE

PANEL F: CAYCE, C.J.; GARDNER and MCCOY, JJ.

DELIVERED: April 24, 2008

29